Council, I would urge you to get to your most important issue first. The appellant should save some time. I would like to take 12 minutes to present the relinquishment argument, and Mr. O'Neill will address the staff for it. Okay, that's fine. Thank you. All right, thank you. Whenever you're ready, Ms. Eaton. Good morning, Your Honors. Tim Eaton on behalf of the village of Bellwood, the appellant. Your Honor, the issue that's at stake here is whether or not the residents of the village of Bellwood are going to be denied their unconditional right under this eminent domain statute to abandon the condemnation proceeding brought under the eminent domain act after an agreement was reached as to the price, the date of the possession, and when the title would pass, an agreement that did not reference at all their statutory right to abandonment. Secondly, if they're denied that right. Can we take a time out here? Yes, absolutely, Your Honor. I think you just covered my first question. You indicated that the agreements, because there were a bunch of them, weren't there one for each property or something to that effect? Yes, sir. Did any of them have the word abandon in them? No. So the agreement was silent? Absolutely. The only thing that was in the agreement, there were four major points that were in the agreement. The first one related to the price that would be paid for the properties. The second one related to when the payment would be made. The third related to when the title would pass, which was going to be on September 1st, 2009, when the payment was made. And the fourth point dealt with the possession of the property, which would be September 2nd, the day after the title passed. You forgot something kind of important. It also did not include a relinquishment of anything that could have been raised, a waiver of a right to appeal, essentially. With respect to the issues it addressed, yes. Not with respect to the abandonment. Because, Your Honor, the statutory right to abandonment has been well settled in Illinois, case after case after case. The only way that could have been addressed and waived is if it was explicit in the agreement. And apropos to your first question, did any of those agreements reference the word abandonment? The answer is no. As a matter of fact, in the argument below, Judge White asked, has there ever been a case that counsel can cite where the right to abandonment has been denied, where there has been an agreement that relates to the price? And the answer by all counsel was no. Your Honor, this is a case of first impression. And in the Crystal Lake case, which we cite in our brief, it references in that case that it is quite common in eminent domain proceedings for the parties to reach an agreement as to price so they don't have to go forward with a trial and a jury to determine fair compensation. And, Your Honor, the nature of condemnation proceedings is essentially to reach what would be fair compensation for the properties. Then once that is village, in this case, or municipality, has the opportunity to abandon before they take possession. Prior to taking possession, entitled passing, they have the right to walk away from it. In this case, there was an agreement reached as to price, again, possession. Nowhere does it say they gave up their right to abandon. So what happened was we came in on August 31st, 2009, just prior to the date that the money was to be deposited. I believe the deposit date was September 1st. And we said this project has become financially infeasible. We don't have a developer. We can't go through with it. The economy has collapsed. And moreover, we have environmental contamination on two of the properties, which we thought could be resolved for a much lesser amount. And in the meantime, it had become more significant. I think it had gone from 1.8 to perhaps 3.5. And for those reasons, they walked away. To go forward ‑‑ I'll be happy to. Your Honor, the case law in Illinois has indicated when you're trying to apply equitable estoppel against a municipality or city or village, the courts have been very reluctant to do so because they ultimately believe the burden is going to be imposed upon the taxpayers. Where they have done it have been instances of where there has been misrepresentations, fraud, something that indicates bad faith. Under those circumstances, they may decide to apply equitable estoppel. None of those factors are present here. There is not one bit of evidence that the village misrepresented anything other than we intend to take these properties and then later exercise their statutory right not to. Approximately nine months. They had been negotiated over a period of time. And, Your Honor, that's not unusual because the time frame is built in, in order to make the deposit. And it's not unusual to have an agreement that has been pending for, well, I don't know, what was the time frame between when those agreements were filed with the court and the day before they were supposed to make the deposit, I think. usually the property owner's time to vacate or to get ready for the village to come in and take possession. During that period of time, the village is faced with a number of dilemmas because they can't go forward with it. So the consequences of forcing them to go forward with what was a judgment on property ownership, which was a judgment on property ownership, was a judgment on property ownership. only is going to put the burden on the taxpayers and the legislature and their wisdom has said as a matter of public policy with property owners versus the larger interests and their opinion of the village, we're going to give the village a right to walk away. And, sure. I'm going to just interrupt you one more time and then I'll sit down and shut up. I welcome your questions, Your Honor. Is there anything preventing, was there anything preventing the participants in this case from indicating specifically in the agreement that the village, Bellwood, was waiving or giving up or relinquishing, forfeiting its right of abandonment? Absolutely, they could have done it. And in light of the well-settled law in this jurisdiction that deals with the right to abandonment, in light of the well-settled law that says if you're going to waive something, particularly a statutory right, it must be explicit and expressed, everyone was represented by counsel, if they wanted this agreement to waive the right to abandonment, it should have been explicit. And, Your Honor, if there had been an agreement that had that waiver in it, we would not be here today. This would have gone forward. But there was nothing in it. So what the property owners are relying on is some language that relates to other issues that could have been raised, appeal rights, all of which relates only to the condemnation proceedings. And, Your Honor, also to follow up again on one of your earlier questions with respect to the village waiting until August 31st, for example, to give the notice, in looking at some of the other jurisdictions that have been cited in this case, California is one, I think there was a case in the Second Circuit, the Cole case, in some of those jurisdictions, they give a definite frame of time in which you can abandon, 60 days, for example, in one of the cases I recall. So after 60 days, either the village is going to go forward or they're not. Here, our legislature has not imposed a time limit. The only thing the legislature has said under 7-110 is prior to taking possession. Once you take possession, you cannot abandon unless all parties consent. And, of course, we don't have that situation here. Was this initiated as a quick take? No, Your Honor. This was, go ahead. It was not a quick take? No. No. This was, actually, it was initiated in December of 2006. And the parties negotiated the price ultimately over a period of time and eventually reached an agreement sometime in early 2008. And then it provided for a deposit date in 2009. Whether it was a quick take or not, would that affect the right of the village to abandon? No, Your Honor. In the case of the City of Chicago v. Harris, that was exactly the case. Not related to me, I hope. No. Harris Bank. Okay. No relation. No relation, I assure you. That decision was of the First District in 2004. Justice Quinn authored the opinion. And that did involve a quick take of, actually, it was a billboard, a leasehold interest in a billboard on a building. And there was a quick take to determine the price. And, as Your Honor knows, in a quick take proceeding, you can take possession and you're just determining a preliminary price. And at that point, the city had actually deposited with the bank the amount that was determined at a hearing based on the quick take. But they never took possession. Okay. Quick take certainly doesn't mean immediate possession. It does not. It does require that there be money transferred. And also, what I thought was important in that First District case was that Judge Quinn said he didn't see any basis to distinguish between a quick take and a condemnation proceeding that was going to go to a verdict in terms of the application of the right to abandon. Because that argument was raised and rejected in the City of Chicago v. Harris case where they tried to make that distinction and they said there shouldn't be. Mr. Eaton, back to my equitable estoppel inquiry. In Hawthorne Racecourse v. Illinois Racing Board, they talk about, the court talks about courts will only invoke equitable estoppel against the public body to prevent fraud and injustice. Well, I think we all agree that there's no fraud here. But what about injustice? Well, Your Honor, I think the legislature has addressed that. Two things happen. One, the property owners get the property back. Two, they are given their fees for having to defend the condemnation proceeding. So the legislature through the statute has said here's the remedy we'll give you. We'll allow you to bill the time to the city who started this condemnation proceeding if we abandon. So I think that addresses the issue of injustice. Now, is it perfect? No. Is there inconvenience in having brought this? Absolutely. But the legislature has weighed those interests and this is what they came up with as a remedy. And also in that City of Chicago v. Harris case, there was some suggestion in that case about bad faith. Because they were suggesting that maybe the city, after they had condemned the property and then backed off, were going to try to condemn it later after the value dropped and then get a second bite at the apple. And this court found there was no evidence that that was the case. There's no evidence in this case that that's what they wanted to do. In fact, they wanted to get as far away from this project as they can. And that was indicated when they filed their motion to abandon. So in short, Your Honor, I see my time, initial time has expired. But I do just want to emphasize that the legislature has made this right to abandon unconditional. There's no waiver here that was at all explicit that word abandonment is not in that agreement. And there's no equitable estoppel based upon any indicia at all of bad faith. Thank you, Mr. Eaton. May it please the court. My name is Mark O'Toole. And again, I represent the fee owners of the properties, the Eppleys. Mr. O'Toole, why didn't it say anything in these agreements vis-a-vis the right to abandon? Well, Your Honor, I think it did address that. And if I may, take one second to get organized here. The agreements, and most importantly, and I think, Your Honor, you referenced this, pledged that the order was final and disposed of all issues, all issues, with the exception of one. And that was the environmental issue that Mr. Eaton just referred to, which had been raised or which could have been raised in the action between the owners on one hand and Bellwood on the other hand pertaining to the condemnation case. Now, Mr. Eaton apparently is trying to split hairs in between a difference between the condemnation proceeding and a motion to abandon. Well, you can't bring a motion to abandon in anything else besides the condemnation proceeding. There's no difference. And therefore, that issue, I'm sorry, I've jumped ahead of myself. The issue was specifically addressed, Your Honor, that you're talking about. And it clearly, and if you look at the other terms, a little contract interpretation, if you look at the other terms of the agreement, it clearly is established in there that there was no right that was reserved by Bellwood to abandon. They gave up that right. Clearly, these agreements were extensively negotiated. They were entered after. How did they give it up? If you look at the entire agreements, and if I may spend two seconds here, and I'm a lawyer desperately in need of some bifocals. Welcome to the club. This is a very bad problem. The preamble to the agreement provides that the cause having come before the court for the entry of certain stipulations and a final judgment were resolving all issues in this matter. And specifically, this is one of the matters that they gave up. The agreement is extensive, and it was, as to the fair market value, it says that they shall deposit, they shall pay. They waived their right to appeal, and specifically, again, in the language that I'm referring to, is they disposed of all the issues which had been raised or which could have been raised in this action with the exception, again, of just the environmental matter. Well, Mr. O'Toole, back to Justice Karnazes' question of Mr. Eaton earlier. Assuming that abandonment would be one of the big issues that you'd be concerned about, having negotiated all of this other stuff, and you get down to the wire and suddenly the bill changes its mind, what precluded you from actually writing that into the agreement? There was no preclusion, Your Honor. But wouldn't it have been a good idea just to write it in? And as Mr. Eaton said, you wouldn't be here had that specifically been written in, because this whole eminent domain thing is very statutory, as we all can agree. Correct. It's strictly construed. So you've got to cross your T's and dot your I's. And I would think that something like abandonment, which is, you know, that could sink the whole ship, that if you want to make sure that later you're going to hang your hat on that, that that would be in the agreement. I agree with you, Your Honor, that we wouldn't be here today if there was a specific reference to abandonment. But I don't agree with you that this agreement did not contemplate the abandonment. I think it clearly did. And I think if you look at the case law here, there is plenty of case law that says that the condom nor has a statutory right to abandon, that they can abandon after a judgment is entered. They can abandon even after they deposit the money and take title, which is the Harris Bank case, which, by the way, was decided by the same judge, Judge White, who is the presiding judge of tax and miscellaneous remedies, who hears all the condemnation cases in Cook County that decided this particular issue. However, we're interested in cases that specifically point out at what point the right to abandon is terminated. You have cases that tell us it still exists, it still exists. What cases are out there that tell us when the right to abandon has been terminated? There is not one in Illinois. There is not one case that Bellwood has cited to that says that they have an absolute right to set aside the party's settlement agreement in a condemnation case. And there's no case in Illinois that's found that a condom nor has a right to abandon after relinquishing that right, which they clearly did in this case. So what does Bellwood do? They go outside of Illinois, they go down to Arkansas, and they cite a couple of cases from Arkansas. And in those two Arkansas cases, the Vogel and the Sully case, neither court was called upon to determine whether a condom nor had relinquished its right to abandon. But really what's most important is in the Sully case is the court, citing from the American law reports, opened the door or recognized that the door was open. They said, while the right to abandon condemnation proceedings may not be relinquished by agreement or lost by estoppel, or I'm sorry, while the right to abandon the proceedings may be relinquished by agreement or lost by estoppel, the general rule is, as Mr. Reaton says, they have a right to continue the proceedings until the party's rights have reciprocally vested. And in this case, once that agreement was entered, there was a reciprocal vesting of a right. My clients, many of whom are here today, had a right to receive those proceeds. It's important to note that, and I think, Justice, you had alluded to the time frame here, these cases were filed in 2006. We agreed as to a price in March of 08. It took eight months before final judgment orders, agreed stipulation of final judgment orders were presented to the court. All that time was used, even according to Bellwood, to negotiate these extensive agreements. Coming in now and saying that these are just agreements as to price is just wrong. Well, you know, I think what you're, I'm going to put words into your mouth. Please. We call this, over at 26th and California, the it ain't right and it ain't fair doctrine. And who, if I could backtrack a bit, who drafted the agreement? Bellwood. The same people who are trying to escape the terms that are set forth. That's, you're saying, that's the answer. His comment about it not being right and not being fair, according to the legend. Makes it a lot less right. Let me ask you a question about section 7-110, which reads, after the plaintiff has taken possession of the property pursuant to the order of taking, the plaintiff shall have no right to dismiss the complaint or to abandon the proceeding, blah, blah, blah, blah. Did Bellwood ever take possession of the property? Well, that's an interesting question, too, Your Honor. And they've asserted control over that property. Because one of the provisions in the agreement was. But I think taking possession has a specific and particular legal meaning within this context. And that's the context within which I'm asking my question. No, and I appreciate that. When you and I think about possession, we think about physical possession of the property. When you look at real estate, there's a bundle of rights that people have. Within the agreement, the extensively negotiated agreement, Bellwood requested, and the owners gave them, each and every owner said that they will not execute or otherwise consent to any leases, license agreements, use or occupancy agreements, for the entire period of time, which extended from the time that the judgments were entered in November, approximately November 2008, in September 1. They agreed that there would be a complete standstill. And that Bellwood would have the, we would have to go to Bellwood to obtain consent, which would be in their sole discretion. So there was a bundle of rights that were transferred in these agreements, which are mischaracterized as agreements only to value. Well, that's a long answer, and I'm not sure if I got the answer to my question, which was. The answer is, is they didn't physically invade the property. They didn't dispossess the owners, but they certainly took control. They've acted as if they had control over these properties for some time. And that's. The answer is no. Right. No, they did not physically invade the property. So my follow-up question is, then, if that is true, I mean, you know, I caught one of my colleagues. When we write, we have to write something when we write an opinion. We have to pretty much follow the law. Well, there isn't much to go on here. Doesn't this statute basically say that if they didn't take possession of the property, they can abandon it? I mean, isn't that what that section allows them to do? What that section does is it sets the outer limit from which they can no longer abandon. But it certainly, it is not the sole test for the existence of the expiration of the right to abandon. What I'm saying is, is you can relinquish that right. I'm saying exactly what the Selly Court said, which they've cited as authority, is that you can relinquish the right to abandon by agreement. And, boy, it makes a lot of sense, too. And the reason I say that is because it would be illogical if there was an absolute unconditional right to abandon. And let me give you a couple of examples. Well, first of all, it would be in this particular case where there was a judgment that was entered. And after the judgment, there's a nonpayment. So because of the law in the state of Illinois, you say, well, we have a nonpayment of the judgment. Therefore, we have a right to abandon. Therefore, we can bring a motion to dismiss the complaint. And therefore, all of the judgment orders that we've entered are effectively void. It's a unilateral agreement. No party could ever enforce that agreement in the future if this court decides that they have an absolute unconditional right to abandon the case. The other is more practical. As an eminent domain practitioner, I can tell you what will happen, is that in each and every case where there is a condemnation complaint filed, whether the business is being taken as large or small, it doesn't matter. What happens after that is they'll negotiate with the condemning entity. They may or may not enter into an agreement. After they enter into an agreement, they may even deposit, like they did in the Harris case. They may even take title. But the owner is going to pick up the phone, and he's going to call his attorney. And the attorney is going to say, what do I do? Should I move? Should I withdraw the money? And the attorney is now going to say, if they have an absolute binding right, I would sit still. Because once you move, once you buy a new facility, once you move your equipment and machinery, and you dispossess yourself of your own property, if they haven't asserted possession of that property, and they don't have the right to bind themselves, they have an absolute right to walk away. That's illogical. It doesn't make any sense. So there really is no case law that supports this position that they have an unconditional right. It's illogical from a standpoint that would create unilateral agreements. And third, it's just not practical. So the question then becomes, is what do the agreements say? And what the agreements say, that were drafted again by Bellwood, and I've given you the time period of how extensive they are, is that these address much more than just the value of the property. There were stipulations not only as to the value, the timing of the payment, and the possession dates. By the way, each of the possession dates in each one of these orders differed. It was not always September 2nd. In some cases, there were holdover periods. There were penalties for those holdover periods. Mr. O'Toole, you've actually gotten to the end of your time. I'm giving you ten minutes to wrap up. I apologize. I am very close to the end of my argument, I understand. But at the end of the day, they waived their right to appeal, and, Justice, as we talked about, they gave away any and all right to abandon. The only right that they reserved was the right to address the environmental issue. They said again, it's final, disposes of all issues with the exception of that environmental issue. Clearly, any practitioner would believe that at that point the rights of the parties were reciprocally vested. I may say in closing that all of the owners recognize the difficult economic environment that municipalities face. All of the owners face that same environment. But the law in Illinois should not be changed because of the economic environment. And here what they're asking you to do is to change that law. The disproportionate burden of this public project, the failed project, shouldn't fall on the shoulders of a few, but it should fall upon the shoulders of all of the municipalities who brought this action and really cast a long and dark cloud over these properties, which right now makes them illiquid. These owners have illiquid assets. And thank you very much for your time today. Thank you, Mr. King. May it please the Court, my name is Bill O'Neill and I represent Hanchette Industries. Hanchette is the lessee of one of the seven properties that are subject to this appeal. I'd like to address the equitable estoppel argument with you today. This argument also applies to the landowners of the seven properties, but it's particularly compelling as it relates to my client Hanchette. Hanchette has been the lessee of the Bellwood property since 1991. Hanchette was in the ink and dye manufacturing business, and the Bellwood facility was its principal manufacturing facility. Beginning in 2006, based on representations by Bellwood, that it was going to take the property that Hanchette used for its manufacturing facility by the powers of eminent domain, Hanchette began to look for an exit strategy. It has a heavy industry business with big machinery and lots of employees. Its efforts to find an exit strategy for this business accelerated when it received the agreed and stipulated judgment in 2008. In direct reliance upon that judgment, Hanchette sold its entire business and signed a non-compete agreement. The transaction was signed in May of 2009 and was to close in October of 2009. Beyond the agreed judgment, Hanchette also received from the village of Bellwood a letter dated August 6, 2009. Now, this letter was dated just 25 days before Bellwood was to take and pay for the property, pursuant to the agreed judgment. In this letter, Bellwood instructed Hanchette to vacate the property by September 2, 2009, just four short weeks later. Based on this letter, Hanchette accelerated rapidly its efforts to consummate the transaction and sell its business. As a result of Bellwood's decision to renege on the agreed judgment, the landowners face actually in excess of two years of additional rent payments at an annual cost approaching $1 million a year. When this is all said and done and this lease expires at the end of 2011, Hanchette will have paid 27 months of rent, taxes, security, and maintenance for a substantial manufacturing facility for which it has received actually no beneficial use or enjoyment of. How much, in simple terms, how much money are you saying your client is out as a result of the last-minute decision by Bellwood to abandon this eminent domain action? Just over $2 million. Okay. So to put it succinctly, I don't think this Court could be presented with a more compelling factual scenario to invoke the doctrine of equitable estoppel. As Justice Karnazes said, this is the it-ain't-right-it-ain't-fair doctrine. The elements of equitable estoppel. I know I'm going to be. I mean, I know I'm going to be. Sorry I said that. One way or the other. The elements are plainly met here. We've got representations by the Village of Bellwood. We have reasonable and detrimental reliance, and we have damages. And these damages, I might add, are indisputed. In Bellwood's opening brief on page 34 at footnote 7, they concede that Hanchette suffered damages as a result of the continuing existence of its lease. There's absolutely no viable defense as it relates to Hanchette's equitable estoppel argument. Hanchette played no part in the taking of this property. It did not have a seat at the negotiating table when the agreed judgment was signed and entered. So you're basically hanging your hat on the injustice prong of the case law that talks about the right to abandon is basically statutory unless it's fraud or injustice. And injustice is what you're talking about, isn't it? You're not alleging that there's any fraud here. Well, I would say there are misrepresentations here. The misrepresentations are absolutely per se here. When you look at the August 6th letter sent just four weeks before they reneged on that agreed judgment. We're talking about fraud or injustice. And, you know, misrepresentation, certainly that can be subject to differing views as to what's meant by the same statement. So that's not what I'm talking about. I think we can all agree that there's no fraud here, fraud as defined by Illinois case law. But what about injustice? That's what you're really talking about, isn't it? That's precisely correct. Well, if we were to decide for Bellwood, wouldn't your client still have a remedy somewhere? For every wrong, there must be a remedy. What would you pursue? Some sort of detrimental reliance theory? My client is pursuing or is attempting to pursue, and that's another appeal that's before this Court, an inverse condemnation claim against the village. And Bellwood has sought to stay that counterclaim. Judge White denied that, and Bellwood's appealed that order. So there's another case that will be before this Court about whether we can. So we've been trying to pursue this claim, and Bellwood has taken an appeal of the judge's decision not to stay that case. So we are trying to seek some type of remedy in another avenue. But that does not, I don't believe, preclude this Court from providing that remedy here. Oh, certainly. Certainly. However, if we have the legislature creating a statute and we have to enforce it by a simple, clear understanding of what they say, it seems to me we have a legislature that's saying, for public policy reasons, we're allowing municipalities to reject up to the very last moment, possibly, calling it abandonment. To that, I would say exactly what Mr. O'Toole began to say, which is if you accept Bellwood's interpretation of the statute, there could never be a viable settlement agreement to resolve a condemnation proceeding. Yes, there could, because this could be the case where practitioners wake up to expressly waiving abandonment. I would say, Justice, this doesn't have to be that case, because I think it is encompassed in the body of that agreed judgment that they did waive that right. I'll conclude by noting that the response to my position from Bellwood is, you can't get us on this, we're immune, we're a municipality, the doctrine of equitable estoppel cannot be applied to us, and I would just say that is not the law of Illinois. In other words, Bellwood's position is there's no remedy, as Justice Harris asked you earlier, isn't it for every wrong there's a remedy, and you're saying that Bellwood denies that there's a remedy for the $2 million that Handersheet is out because of Bellwood's decision to abandon this eminent domain action? That's what I believe. And if we look at the California Supreme Court cases cited in our brief, the case involving the Los Angeles Times news publication, it is a compelling case, and that is an en banc decision of the California Supreme Court, and it's persuasive authority for this Court, but the facts in that case were less compelling here. There was no agreed judgment there, and yet they still use the doctrine of equitable estoppel to prevent exactly what's happening here after the substantial expenditure of funds to build a new facility to print the newspaper. Unless you have any other questions, I will. Well, thank you very much, Mr. Rios. Thank you. Thank you, sir. Mr. Eaton, brief rebuttal, please. How are you going to make them whole? I mean, did you not mention that while there is a remedy, that the courts have made somebody whole, paid their fees or whatever the case may be? That's what the legislature has provided. What the legislature has provided is that if you're going to abandon, you're going to have to pay their attorneys' fees and costs for having to defend the condemnation proceeding. That's what they provide. There is an inverse condemnation proceeding pending before Judge White. Our position was it should be stayed pending resolution of this case before this Court. Yeah, but their losses go beyond the fees and the costs. It's a litany of consequential damages. Well, and, Your Honor, first of all, I don't want that $2 million number to go unchallenged. We're not to the merits on that. All there is is a complaint. Secondly, we'll have to fight that fight because this is not, they had leasehold interests that we did not seek to condemn, unlike the City of Chicago v. Harris case. We have no interest in gaining their lease, but they were named because they had an interest in property that was being condemned. So they're in a little different position here than the property owners, and that's going to have to be sorted out. And in answer to your question, and Justice Cunningham's question, the legislature has provided, whether we agree or disagree with them, that there's an unconditional right prior to possession. And this is actually the first time that I've heard today, because it wasn't raised in the briefs, that somehow having these other controls in the agreement is some sort of quasi-possession. The question that you asked, Justice Cunningham, is did they take possession, and counsel didn't want to answer, and finally Justice Garnesas had to answer it for them, was the answer is no. They did not take possession. Judge White never found they took possession. That's never been an issue until a few minutes ago. We have an unconditional right to walk away. With respect to the agreement, and I think you covered this, Justice Harrison, I know Justice Garnesas did. In the agreement it says, Bellwood and owner exchange information and appraisals, and with the assistance of their respective legal counsel, being fully informed of all of their rights under the law. Mr. O'Toole signed this agreement. You ask who drafted it. He said three or four times after extensive negotiations, and he answers your question, Bellwood? After extensive negotiations, all counsel signed this. This was a heavily negotiated document. If they wanted to put in there that we had no right to abandon, they could have. We would not have been here today, and the village we believe has the right to walk away from this. There's no time element, and if there's a problem with that, the property owners have to petition the legislature to change the law. So, Mr. Eaton, you're basically saying, well, Justice Garnesas' statement about it ain't right and it ain't fair may be true, but so what, right? Wrong form to address it, with all due respect. Thank you very much. Thank you, counsel. Thank both sets of lawyers for very well-articulated arguments. This case will be taken under advisement.